Laramore, Judge,
delivered the opinion of the court:
Plaintiff, a retired captain in the U.S. Naval Deserve, sues to recover active duty pay and allowances allegedly due him for certain periods commencing December 27,1949 and ending September 29, 1950, while receiving treatment in the Naval Medical Center, Bethesda, Maryland, under the provisions of section 4 of the Naval Aviation Personnel Act of 1940, 54 Stat. 864, as amended by section 1, P.L. 108, 63 Stat. 201, 34 U.S.C. § 855c-l (1952 Ed.), which provides, in pertinent part, as follows:
All officers, nurses, warrant officers, and enlisted men of the United States Naval Reserve or United States Marine Corps Reserve, who—
❖ * * * ❖
(2) if called or ordered by the Federal Government to active naval or military service or to perform active *666 •duty for training or inactive-duty training for any period of time, suffer disability or death in line of duty from injury while so employed; shall be deemed to have been in the active naval service during such period, and they * * * shall be in all respects entitled to receive the same pensions, compensation, death gratuity, retirement pay, hospital benefits, and pay and. allowances as are now or may hereafter be provided by law or regulation for officers, warrant officers, nurses, and enlisted men of corresponding grades and length, of service of the Regular Navy or Marine Corps: *. *
Two questions are involved in this case: (1) did plaintiff suffer an injury while on active duty; (2) is recovery barred by reason of the provisions of section 6 of the Act of May 10, 1916, 39 Stat. 120,' as amended August 29, 1916, 39 Stat. 582, which provides in pertinent part, as foliows:
That unless otherwise specificially authorized by law, ho money appropriated by this or any other'Act shall be available for payment to any person receiving more than • one salary when- the combined .amount of said salaries exceeds the sum of $2,000 per annum; * * *.
Turning first to the question whether or not plaintiff is barred . from recovery under the provisions of section 6, supra, plaintiff argues that dual compensation is specifically authorized in all cases similar to that of plaintiff and cites in support thereof section.4 of the Naval Reserve Act of 1938, 52 Stat. 1175, 1176, which provides, in pertinent part, as follows:
* * * And provided further, That no existing law shall be construed to prevent any member of the Naval Reserve from accepting employment in any civil branch of the-public, service nor from receiving, the pay and allowances incident to such employment in addition to any pay and allowances to which he may be entitled under the" provisions ,of this Act, nor as prohibiting him from practicing his civilian profession or occupation before or in connection with any department of the Federal Government.
This court, in Tanner et al. v. United States, 129 Ct. Cl. 792, 125 F. Supp. 240 (1954), cert. denied, 350 U.S. 842, in discussing the limited coverage of section 4 of the Naval Reserve Act, supra, stated in part, as follows:
*667 Section 4 of the Naval Reserve Act of 1938, 52 Stat. 1176, contained, with, reference to the Naval Reserve,language similar to that of Section 1(b) of the 1947 Act. It was, however, limited in a respect, the significance of which appears hereinafter.
H; :¡í ‡ ‡ $
* * * We have said above that there was an important difference between Section 4 of the Naval Reserve Act of 1938, and Section 1(b) of the 1947 Act here in question, which applied.to Reserve Officers of the Army. Section 4 of the 1938 Act said that no existing law should be construed to prevent a member of the Naval Reserve from holding a civilian position with the Government and'receiving the pay of that position in addition to any pay and allowances to which he might be entitled “under the provisions of this Act,” i.e., the 1938 Act. .The exemption from Section 212 was therefore not applicable to pay and allowances . of a Reserve officer granted by legislation other than the 1938 Act. [pp. 796-797]
Again this court in Broyderick, et al. v. United States, 140 Ct. Cl. 427 (1957), in discussing the same question as recited above, stated in part, as follows:
- Section 4 of the Naval Reserve Act of 1938, 52 Stat. 1176, -similar in text to the statute just’ quoted, but applicable to members of the Naval Reserve, exempted, from the Economy Act only pay and allowances to which the officer “may be entitled under th¿ provisions of this Act.” Small does not receive- his retired pay pursuant to the Naval Reserve Act of 1938, but pursuant to the Act of February 21,1946, 60 Stat. 26: He is not, therefore, covered by the exempting language of - the 1938 Act. In Tanner v. United States, supra, there is a considerable discussion of the limited coverage of section 4 of the Naval Reserve Act of' 1938.
. In the Armed Forces Reserve Act of 1952,66 Stat. 481, the language of the 1947 Act exempting members of the Officers’ Reserve Corps [Army] from the ■ dual compensation restriction, was broadened by section 804(a), effective January 1,1953, to exempt “any member of the reserve' components of the Armed Forces.” -The government concedes that Small was entitled to the benefit of that statute from the effective date of section 804(a), January 1, 1953. He is not entitled to recover for the period of his civilian employment prior to January 1, 1953. * * * [pp. 432-433]
*668 In this case it is clear that Captain Dingley did not receive his pay under the provisions of the 1988 Act, sufra, but pursuant to the Naval Aviation Personnel Act of 1940, sufra. Consequently, section 4 of the 1938 Act has no application to plaintiff.
Furthermore, during the period in question in this case, there was in existence no statute exempting plaintiff from the terms of section 6 of the Act of May 10,1916, as amended, sufra,[1] which is the Act barring payment of more than one salary to any person when the combined salaries exceed $2,-000 per annum. In this case the facts show that during the periods in question Captain Dingley was a civilian employee of the U.S. Government with a salary in excess of $2,000 per year.
Plaintiff’s counsel, in oral argument, asked and was granted permission to supply the court with the legislative history of P.L. 108, supra, stating that said legislative history shows Congress never intended that plaintiff be saddled with the Economy Act (section 6 of the Act of May 10, 1916, as amended, supra).
He has supplied the complete legislative history of the Act which is long and voluminous. He has pointed to no portion which would give comfort t¡o this plaintiff and we find none.
Consequently, we conclude that section 6 of the Act of May 10, 1916, as amended, supra, bars any recovery by plaintiff.
Defendant has filed a counterclaim in the amount of $50 for food rations from the National Naval Medical Center, which is allegedly owing and unpaid by plaintiff. However, on brief, the defendant asks merely that this amount be deducted in the event the court finds that plaintiff is entitled to recover. Since we have found that plaintiff cannot recover, we accordingly dismiss defendant’s counterclaim.
In summary, plaintiff is not entitled to recover, and his petition is dismissed. Defendant is not entitled to recover on its counterclaim and the same is dismissed.
In the light of the above, it is unnecessary to decide whether plaintiff was suffering from an “injury” or a “disease”.
*669 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) Plaintiff, who was born in the State of Michigan on July 18,1902, is a resident of the State of Virginia.
(b) On September 7, 1928, he was commissioned an officer in the United States Naval Reserve.
(c) On April 14,1942, he was recommissioned in the United States Naval Reserve.
(d) On September 13, 1946, he was given a physical examination by the United States Navy for release to inactive duty and found to be without defects and physically qualified for release to inactive duty. Thereafter, and until July 12, 1949, he was required to take a physical examination each time he went on active duty for training as he did most every year. He was “never told by anyone” that he had a diminution of the mineralization of the bones of his back.
(e) On July 6, 1949, he was ordered to 14 days training duty with pay at the United States Naval Communications Station, Cheltenham, Maryland, commencing July 12, 1949.
(f) On July 12,1949, he was given a physical examination by the United States Navy and found to be physically qualified for active duty training.
(g) On October 27, 1950, he was discharged as a captain.
2. (a) In this suit plaintiff seeks to recover pay and allowances alleged to be due him under the provisions of section 4 of the Naval Aviation Personnel Act of 1940.[1] On May 9, *670 1962, this court denied both plaintiff’s and defendant’s motions for summary judgment. The court stated:
* * * Since there has been,, as yet, no factual determination as to whether plaintiff suffered from a disease or an “injury,” the case is referred to the Commissioner under Rule 37. * * *
(b) At a pretrial conference the parties stipulated that (1) the sole issue relating to the right of plaintiff to recover is the determination of whether plaintiff suffered from a disease or from an injury while on active duty for training in July of 1949, and (2) assuming, arguendo, that plaintiff is entitled to recover, then there is for determination of the court the issue as to whether he would be entitled to recover both his naval pay and allowances and his compensation as a civilian employee of the Government. At the pretrial conference the parties agreed, with the approval of the commissioner, that the trial of the case be iimited pursuant to Rule 38 (c) to the issues of fact and law relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
3. (a) During the two weeks active duty training (July ,12 until July 23, 1949) plaintiff had no physical trauma to his body.
(b) On July 23,1949, plaintiff was at his home in Arlington, Virginia, on a weekend liberty from his assigned duty station. Respecting the occurrence on that date, he testified at the trial as follows:
* * * I was at home on authorized leave, and I was mowing my lawn, as I had done many, many times before, and was pushing a lawn mower up a terrace, as I had done many times before, when, on this particular occasion, something snapped in my back, and it was severe enough to make me stop mowing the lawn. It wasn’t agonizing, but I had a real crick in my back, and so I went into the house and laid down, and I rested, and I could get up when I felt like getting up, but I was lame in my back, * * *.
4. On July 25,1949, plaintiff was given a physical examination for release from active training.
(a) Respecting his conversation with the medical examiner he testified at the trial as follows:
*671 * * * [I]n answer to the medical examiner’s question' of how I felt, I said I felt fine, but I had an awful back, so I told'him how I had been mowing the lawn and something snapped in my back, and he put it in the.record.
It wasn’t told to him for any purpose of getting in the record. I was merely answering his question as to how I felt. I felt, at that time, as any normal person would feel, who had a lame back, that it was a temporary thing, and didn’t amount to much of anything, but it was just lame, and so I was relieved from my active duty status, and I returned to my civilian duties. * * '*
(b) Plaintiff was found physically qualified for release from active duty training. -The “Defects Noted” by the examining officer were:
This officer while mowing his lawn on 7-23-49 experienced pain in lumbo-sacral region. Examination reveals no area of definite tenderness.. X-Rays negative. There is some pain complained of on certain movements as arising from a sitting position and while lying down. A probable myositis of the lumbar muscle is present which should improve on rest and heat locally. Entered for record.
Plaintiff did not ask for treatment because he “assumed that none was necessary.”
5. (a) After his release from active duty training plaintiff returned to his home, but “the lameness didn’t get any better. It stayed about the same.”
(b) In the latter part of August 1949, plaintiff went to a Navy dispensary and “told them that this thing wasn’t getting any better and was there anything that the Navy could do, to take a look-see and see what was the matter.” Plaintiff was sent from the dispensary with a note to the United States Naval Hospital, Bethesda, Maryland, where, on August 27, 1949, he was examined by the chief of orthopedic surgery. At the time of the examination,-plaintiff was reported suffering from a mild chronic low back sprain and he was advised to sleep on a hard bed, preferably with a board between spring and mattress,- and that a sacroiliac support would be of some benefit. His' condition did not warrant hospitalization. Plaintiff testified at the trial that he was advised by the doctors “that there didn’t seem to be anything out of place *672 or wrong, that lie probably just strained some back muscles, and that his back would probably get all right.”
(c) Following the examination plaintiff’s back “continued in the same way” and he “went to an osteopath several times.”
6. (a) “In December 1949,” plaintiff testified, “I was lying in bed. I had been to sleep, and I woke up with back muscles, those two big muscles going up and down your back, clenched in a Charlie Horse, like you get a Charlie Horse in your leg, and, gee, how that hurt, and I couldn’t get up out of bed. I hollered for help, for someone to pull me up in a sitting position, and that relieved it.
“Then I went to the Naval Hospital and told them what happened and asked them to take a better look, and I think it was at that time, in December — yes, it was then that they admitted me to the hospital for observation and, while I was in the hospital, I had several recurrences of these Charlie Horses or spasms, whatever you call them, and I would like to add this thing that, up to the time of that big muscle spasm in December that brought me into the Naval Hospital, I never considered this anything more than a lame back, and it was something that was going to get well and be all right.”
(b) On December 27, 1949, plaintiff was admitted, at his own request, to the Bethesda Naval Medical Center as a Veterans Administration beneficiary. His disability was diagnosed as “Sprain, Acute, Lumbo-Sacral Joint, #8321.” After receiving varied treatment, he was discharged as a Veterans Administration beneficiary on January 6, 1950, as improved.
7. On February 7, 1950, plaintiff was readmitted to the Bethesda Naval Medical Center as a Veterans Administration beneficiary. The symptoms which occasioned this admission to the hospital were reported by plaintiff to have been precipitated by his sneezing. It was the opinion of the members of the Back Board, who saw and examined plaintiff on April 13, 1950, that plaintiff was primarily an orthopedic and medical problem and that the prognosis and ultimate disposition was indefinite at that time. In the opinion of the Back Board the diagnosis at that time was “sprain, lumbo sacrum, with muscle spasm and osteoporosis, spine, moderately severe.”
*673 8. On May 11, 1950, the Judge Advocate General of the Navy, on the basis of certain medical determinations of the Bureau of Medicine and Surgery, concluded that plaintiff’s disability was the result of an “injury” suffered by him on July 23, 1949, while on active duty for training; and that plaintiff was entitled to benefits under Public Law 108, 81st Congress, 63 Stat. 201, if determined to be otherwise qualified. As a result thereof, plaintiff’s status in the Bethesda Naval Medical Center was changed from Veterans Administration beneficiary to Captain, USNB.
9. (a) Plaintiff remained hospitalized until May 15,1950, when he was allowed to subsist at home.
(b) On August 2, 1950, he returned to the hospital where he remained until August 15,1950, when he was placed in an outpatient status and remained in such status through September 29, 1950.
10. In a decision of the Comptroller General, dated No-, vember 15, 1950, it was stated to the Secretary of the Navy with respect to the periods during which plaintiff “was actually confined to the hospital, i.e., December 27, 1949, to January 6, 1950, and February 7 to May 14, 1950,” that plaintiff was entitled to active duty pay and allowances as a naval reservist on the basis that during such period he was suffering from a disability resulting from an “injury” within the meaning of section 4 of the Naval Aviation Personnel Act of 1940, as amended by section 1 of the Act of June 20, 1949, Public Law 108, 63 Stat. 201; that during the entire period in question plaintiff had been a civilian employee of the Government; that the law authorizes him to be paid only the “same” pay and allowances as are authorized for officers of the Begular Navy; that an officer of the Begular Navy would not legally be entitled to receive his naval pay and allowances and at the same time receive compensation as a civilian employee of the Government; and that if plaintiff desired to be paid his naval pay and allowances during such periods, there would be no objection to correcting his civilian leave record to show his absence during those periods as leave without pay, in which event the necessary steps would have to be taken to recredit the proper appropriation with the amount of the civilian compensation plaintiff was paid.
*674 11. On November 22, 1950, plaintiff was examined by the Veterans Administration and a diagnosis was made of “Osteoporosis, dorsal & lumbar spine, by X-ray — Cause undetermined.” The radiographic report stated:
Dorsal vertebrae: AP and lateral views reveal a moderate degree of osteoporosis of all of the vertebrae. There is no other evidence of any-intrinsic pathology.
Lumbar vertebrae: AP and lateral views reveal a moderate degree of osteoporosis. There is no other evidence of any bony pathology or injury.
Pelvis: There is no evidence of any bony pathology or injury.
12. Under date of March .5, 1951, in response to a request made by the chief, Bureau of Medicine and Surgery, for a comparative reading of,, certain X-ray films taken in plaintiff’s case, the National Naval Medical Center, Bethesda, Maryland, reported as follows:
A study of films taken at the Naval Gun factory on 25 July 1949, shows marked osteoporosis of the entire lumbar spine and pelvis. This is of such degree that m the lateral film the contours of the lower lumbar bodies are only faintly seen. A comparison with films taken at this institution during the early part of 1950 up to August 1950, shows a similar process. Allowing for a difference in density of the films and difference in technique at the two X-ray departments, I believe there has been no change in the degree of osteoporosis that was seen in July 1949. The etiology of this osteoporosis is not apparent but a generalized type such as this man has could conceivably be due to a hyperparathyroidism.
13. On April 24,1951, the chief, Bureau of Medicine and Surgery, advised the commandant, Potomac .Elver Naval Command, regarding plaintiff’s case as follows:
2. The medical record on file indicates that the subject officer was examined and found physically qualified for -active duty training on 12 July 1949. No defects were noted. On 25 July 1949, he was again examined and found physically qualified for release from active duty. At this time, the following note was entered in his record:
“This officer, while mowing his lawn on 7-23-49, experienced pain in lumbo-sacral region. Examination revealed no area of definite tenderness. X-rays negative. There is some pain complained of *675 on certain movements as arising from a sitting position and while lying down. Probably myositis of the lumbar muscles is present which should improve on rest and heat locally. Entered for record.”
3. Following his release from training duty, he is reported to have been under treatment by an osteopath and on one occasion (on August 27, 1949) was seen in consultation by the Chief of the Orthopedic Service at the U.S. Navai Hospital, Bethesda, Maryland. His symptoms and objective findings were not then sufficiently serious to warrant hospitalization and were considered to be due to a mild chronic low back sprain. However, on 27 December 1949, Captain Dingley was admitted to the U.S. Naval Hospital, Bethesda, Maryland as an inpatient. This admission was precipitated by an attempt to lift one of his feet to wash it while taking a shower. Routine clinical and laboratory studies failed to reveal any particular abnormality and on 6 January 1950, he was discharged from treatment as improved. During this period of hospitalization, he was carried under the diagnosis, Sprain, Acute, Lumbo-Sacral Joint.
4. On 7 February 1950, he was again admitted to the U.S. Naval Hospital, Bethesda, Maryland under the diagnosis, Herniation, Nucleus pulposus. The symptoms which occasioned this admission to the sick list were reported to have been precipitated by sneezing. He remained under treatment in the hospital until 15 May 1950, when he was allowed to subsist at home. During this period of hospitalization, he complained of intermittent episodes of “muscle spasms,” the nature of which was not entirely clear. However, thorough studies failed to confirm the diagnosis of Herniation, nucleus, pulposus, and on 15 July 1950, his diagnosis was changed from Herniation, nucleus, pulposus to Osteoporosis Lumbar Spine, by reason of Error.
5. On 10 August 1950, a special orthopedic examination failed to reveal any significant abnormality and the neuropsychiatric impression is quoted as follows:
“An intense, striving, obsessive: type of individual who seemingly has used intellectual endeavor as means of overcoming dependent inferiority trends. It may be that his wife’s death leaving him with two small children reactivated his deep dependent feelings for which his back pains have proved gratification. He is not at all amenable to a psychiatric approach and the length of treatment, the various diagnoses of which he is cognizant, have helped fix *676 the process. If it is not possible to firmly inform bim that his illness is not considered disabling and that no further treatment is indicated, then prompt administrative disposition should be resorted to.”
6. In connection with a prior inquiry as to the nature of the condition for which the subject officer was hospitalized subsequent to 27 December 1949, this Bureau expressed the opinion that the disability was disability due to injury. However, since that time, the diagnosis under which he was then carried has been changed by reason of error to a diagnosis representative of a disease process rather than an injury. Statistically at least, such a change of diagnosis as was made in this officer’s case on 15 July 1950 and for the reason assigned, attributes his entire period of hospitalization subsequent to 7 February 1950 to the condition “Osteoporosis, Lumbar Spine.”
7. Osteoporosis of bony structures is generally regarded as a disease of tissue metabolism which may be secondary to disuse atrophy or malnutrition when protein requirements are not fulfilled. It may also be secondary to scurvy, or may be a manifestation of the postmenopausal state. It is also seen in old age where the bone tissue (like other tissues) atrophies and it is frequently seen in Cushing’s syndrome and acromegaly. In a number of cases, the cause of the condition remains obscure.
8. Although osteoporosis of bone is a disease of tissue metabolism, prolonged immobilization in a cast may produce a disuse atrophy with osteoporosis, and under these circumstances, the disease process might be regarded as secondary to injury, provided the cast were required for treatment of an injury. In this officer’s case, there is no history of any-injury requiring treatment by cast. Back pain, unassociated with specific trauma is common in osteoporosis of the spine and since the other conditions of which bony osteoporosis may be a manifestation are disease processes rather than injuries, it now appears to this Bureau that his hospitalization subsequent to 7 February 1950 must be regarded as hospitalization for treatment of disease, and not for treatment of injury. The exact nature of the underlying disease process is not entirely clear but during his hospitalization, he was treated with multivitamins, testosterone and physiotherapy and under this regime, improved. It would therefore be reasonable to regard the symptoms for which this officer was hospitalized as due to a combination of post-menopausal changes and advancing age with a strong func *677 tional overlay. It is now apparent that the osteoporosis in this case, as well as the functional aspect of his complaints, were not caused by any injury he may have received during training duty in July of 1949. This is confirmed by review of the x-rays taken at the Naval Gun Factory on 25 July 1949 which show the same bone changes in the spine as were noted throughout his hospitalization subsequent to 27 December 1949.
9. The question raised in the basic correspondence is whether the subject officer continued to be disabled for normal pursuits after 15 May 1950 and whether failure to discharge him from the hospital on 15 May 1950 was because of the continued existence of the disability for which originally hospitalized. Resolution of this question appears to be necessary to determine if Captain Dingley is entitled to benefits under the provisions of Public Law 108 — 81st Congress for any period subsequent to 15 May 1950, on which date he.began to subsist,.out. and was no longer an in-patient at the U.S. Naval Hospital, Bethesda, Maryland. In this connection, the Decision of the Assistant Comptroller General of 15 November 1950 (B-96057) that Captain Dingley was entitled to benefits under Public Law 108 — 81st Congress for certain periods prior to 15 May 1950 appears to be based upon this Bureau’s opinion of 12 April 1950 that the disability for which Captain Dingley was then hospitalized was disability due to injury. However, inasmuch as additional studies done subsequent to 12 April 1950 now warrant the conclusion that Captain Dingley’s entire period of hospitalization subsequent to 7 February 1950 was hospitalization for treatment of disease rather than hospitalization for treatment of injury, it would appear that a mere statement that he continued to be disabled after 15 May 1950 because of the same disability for which originally hospitalized would not serve the purpose of the basic inquiry. On the basis of all the information now available, it is therefore the opinion of this Bureau that, although Captain Dingley continued to be disabled for normal pursuits after 15 May 1950, and although failure to discharge him from the hospital on 15 May 1950 was because of the continued existence of the disability for which originally hospitalized, that disability was disability from disease and was not disability from injury.
14. By letter dated October 18,1951, the General Accounting Office requested the chief of the Navy Bureau of Medicine and Surgery to advise “whether it is now considered *678 that the hospitalization from December 27,1949, to January 6, 1950, was due to an ‘injury’ incurred as a result of the lawn mowing incident in July, 1949, or due to the ‘disease’ which now has been determined to have existed at least subsequent to February 7,1950.”
15. Under date of January 29, 1953, the Surgeon General advised the General Accounting Office in part as follows:
Upon the basis of all available evidence in the case of Captain Dingley, including the final determination by the Secretary of the Navy on 17 July 1952 under the provisions of Title IV of the Career Compensation Act of 1949, that Captain Dingley is not unfit to perform the duties of his rank.by reason of physical disability resulting from injury, it is the' considered opinion of the Bureau that the period of hospitalization from 27 December 1949 to 6 January .1950 was not due to disability resulting from injury incurred-as the result'of the lawn mowing incident in July, 1949.
16. By decision .dated February 26, 1953, B-96057, the Comptroller. General advised the'Secretary of the Navy;that in view, of the later determinations, his earlier decision of November 15,1950, was erroneous and should be disregarded; and that “On the basis of the facts now appearing, the officer is not entitled to active duty pay and allowances ás a Naval reservist under section 1 of Public Law 108, for the period December 27,1949, to January 6,1950, or for the period-subsequent to February 7,1950.” • •
17. Prior to the date of plaintiff’s filing in this court, he had not sought relief from the Board for Correction of Naval Records for the pay and allowances how alleged herein to be due him.' On February 7, 1962, the court entered an order suspending action for 30 days in order to afford plaintiff an opportunity to file an application for the correction of his records with the Board for Correction of Naval Records.
18. By letter dated February 26,1962, the Board for Correction of Naval Records advised plaintiff’s attorney as follows:
This is in reference to the application of Mr. Edward N. Dingley, Jr., a former' Captain, U.S. Naval Reserve, which application is dated 13 February 1962 and was received 21 February 1962.
*679 The application requests a correction of record to show that active duty status continued during hospitalization and subsequent outpatient status during periods 27 December 1949 to 6 January 1950 and 7 February 1950 to 29 September 1950.
The Board’s records show that by application dated 22 June 1950 Mr. Dingley petitioned the Board for corrective action, other than that now requested by his application of 13 February 1962, and that final action was taken in his case on 21 December 1950.
■Title 10, U.S. Code, Section 1552, provides that no correction may be made-unless the claimant.or his heir or legal representative files a request therefor before October 26,1961, or within three years after he discovers the error or. injustice, whichever is latér. . However, the Board may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice.
Inasmuch as no'evidence has been submitted which would enable the Board to find it to.be in the interest of justice to excuse the" failure to -file within the prescribed three years and, the Board having determined that insufficient evidence has been presented to warrant such a finding, Mr. Dingley’s application is denied. Mr. Ding-ley is hereby advised of the denial and .of his privilege to submit new and material evidence for consideration.
T9. .The only testimony-offered at the trial was the testimony of plaintiff. Plaintiff’s, counsel had-theretofore advised-thó commissioner that “There will be no medical, testimony as it is .believed-the medical evidence of record covers the problem.” The documentary evidence in the case consists of the Navy medical and personnel records of plaintiff, which were admitted into evidence at a pretrial conference prior to the filing of the cross-motions for summary judgment. In addition, there was received in evidence at the trial an exhibit offered by defendant, Consisting of a report of a physical examination of plaintiff conducted by the. Veterans Administration on November 22,1950. "
20. Plaintiff testified that his back, ailment gradually improved and that since 1952 he has had no trouble with his back and has lost no time from work because of back trouble. He engages in swimming, dancing; and sailing.
. 21. During the entire period involved herein, plaintiff was a civilian employee, of the Government. Plaintiff was paid the compensation of his civilian position with the Armed *680 Forces Security Agency at a salary in excess of $2,000 per year, up to the time he entered a leave without pay status on June 8, 1950. Plaintiff resumed his civilian duties with the Armed Forces Security Agency on October 1,1950, where he remained until retired from the civil service in July 1957.
22. On July 18, 1962, having reached the required age of 60, and having completed more than the required 20 years of satisfactory military service, plaintiff was placed on the Naval Reserve Retired List in the grade of captain with entitlement to retirement pay pursuant to the provisions of Title III of the Army and Air Force Vitalization and Retirement Equalization Act of 1918.
23. The evidence does not establish and plaintiff has not alleged that the decision of the Department of the Navy in determining,/that.-plaintifL suffered. from a “disease”, rather than from an “injury” was arbitrary or capricious or unsupported by substantial evidence.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is, therefore, dismissed.
The court further concludes that as a matter of law the defendant is not entitled to recover on its counterclaim and the same is dismissed.

 Cf. Broyderick, et al. v. United States, supra.

 64 Stat. 864, as amended by 63 Stat. 201. Section 4 provides in pertinent part:
“All officers, nurses, warrant officers, and enlisted men of the united States Naval Reserve or united States Marine Corps Reserve, wbo—
“(2) if called or ordered by the Federal Government to active naval or military service or to perform active duty for training or inactive duty training for any period of time, suffer disability or death in line of duty from injury while so employed; shall be deemed to have been in the active naval service during such period, and they * * * shall be in all respects entitled to receive the same pensions, compensation, death gratuity, retirement pay, hospital benefits, and pay and allowances as are now or may hereafter be provided by law or regulation for officers, warrant officers, nurses, and enlisted men of corresponding grades and length of service of the Regular Navy or Marine Corps: * * (Emphasis added.) Now, as further amended, 10 U.S.C. § 6148(a).